UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

QUINCY THURMAN,                )
                              )
        Plaintiff,            )
                              )        Civil No. 3:21-cv-00013-GFVT
v.                            )
                              )
CITY OF FRANKFORT, *et al.*,  )        **MEMORANDUM OPINION**
                              )        **&**
        Defendants.          )        **ORDER**
                              )

*** *** *** ***

Quincy Thurman worked for the City of Frankfort's Streets Department for decades. He alleges that during that time, the Defendants racially discriminated against him by denying him access to training, denying him promotions, and retaliating against him when he spoke out. He also alleged that the Defendants' actions created a racially hostile workplace during his time with the City. For the reasons that follow, the Defendants' Motion for Summary Judgment **[R. 136]** is **GRANTED IN PART** and **DENIED IN PART.**

**I**

Because the Court is considering the Defendants' motion for summary judgment, it will consider the facts in the light most favorable to Mr. Thurman as the non-moving party. The Court notes that many of the facts in this case are heavily contested. Quincy Thurman was an employee of the City of Frankfort for nearly twenty-five years until his retirement in 2023. [R. 141-2 at 8; R. 141-3 at 9-10.] During that time, he made a number of attempts to climb up the ladder. Between 2004 and 2018 Mr. Thurman applied for eleven positions with the City, most within the Department of Public Works where he worked for almost his entire career. [R. 1.]

Mr. Thurman was denied each and every one of these promotions and retired as a Tech III, a position he had held for decades. [R. 141-3 at 40.] While the Record presents little evidence as to why many of these denials occurred, the City's position is that Mr. Thurman was simply unqualified for them. [R. 136-1 at 14.]

The Street Department has a strict hierarchy, with a focus on seniority, where employees progress through the following positions: Tech I, II, III, Tech IV/Heavy Equipment Operator, Foreman, and Superintendent. [R. 136-3 at 1-2; R. 141-2 at 19; 142-3 at 19.] The Foremen and Superintendents are the Department's bosses, though Tech IVs and heavy equipment operators occasionally function in supervisory roles. [R. 142-7 at 38-39.] No African Americans have held a supervisory position in the Department for as long as many workers can remember. [R. 142-7 at 30; R. 142-3 at 30-31; R. 141-2 at 72-73.] As Foremen and Superintendents must occasionally operate heavy equipment such skills are necessary to advance. [R. 136-4 at 11.] The City's position on Mr. Thurman's qualifications stems from his lack of training on heavy equipment, a skill he admittedly lacked. However, Mr. Thurman's view of the facts is that this training was denied to him by his supervisors and racist heavy equipment operators, a denial that later impeded his growth within the Department. [R. 141-2 at 73; R. 141-3 at 25-27, 35-36; R. 136-22.] That same training, informal though it was, was provided to various White employees within the Department, including ones being groomed for leadership. [R. 141-3 at 27-35.]

During his time with the City of Frankfort, Mr. Thurman also claims that he was subjected to widespread racism. In his view, he was the victim of targeted, racially charged pranks. [R. 141-2 at 54, 65-66.] Many employees of the Department frequently used slurs and racially charged language. [R. 141-2 at 49-51, 55, 58-60; R. 141-3 at 87-90.] On occasion some even directed racial epithets at Mr. Thurman personally. [R. 141-2 at 34; R. 141-3 at 93.] Racist

2

imagery was even placed on a calendar in an area of the breakroom Mr. Thurman was known to sit.  [R. 141-3 at 198-199.]  This kind of language was not only used by Mr. Thurman's co-workers.  More problematically, it was also used by some of Mr. Thurman's supervisors.  [R. 141-2 at 31, 49-50, 58-60; R. 142-3 at 63-64.]  One of these same supervisors told Mr. Thurman that they would never have an African American as their boss.  [R. 141-2 at 36-37.]  When Mr. Thurman attempted to report these issues, his reporting went nowhere.  Instead, he was repeatedly castigated for minor incidents and was described in performance evaluations as disagreeable towards his co-workers.  [R. 136-6; R. 141-2 at 14-15.]

Mr. Thurman reached his breaking point and filed a complaint with the EEOC, which ultimately led to this case.  In response he claims he has faced several forms of retaliation.  He was written up for a minor incident involving his failure to timely report damage to the gas tank of the city truck he was driving.  [R. 136-7 at 9-10.]  He was reassigned to what he sees as a dead-end, do-nothing position that prevented him from learning new skills and achieving his dreams of rising within the Department.  [R. 141-2 at 64-66, 274.]  Mr. Thurman even contends that this reassignment even led to him receiving significantly less overtime than he was previously able to obtain.  [R. 141-2 at 12, 69-70.]  He has now brought state and federal claims challenging the racial discrimination he faced, including failures to train and promote, being subjected to a hostile work environment, and being retaliated against when he tried to improve his situation.  Mr. Thurman has also brought state law claims alleging intentional infliction of emotional distress and negligent supervision.

## II

Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). "Instead, 'the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.'" *J.B-K.-1 v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 462 F. Supp. 3d 724, 731 (E.D. Ky. 2020), *aff'd sub nom. J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721 (6th Cir. 2022) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255).

## A

As an initial matter, Defendants challenge the scope of Mr. Thurman's claims, asserting that any Title VII claims prior to January 2, 2018 are time-barred. [R. 136-1 at 7-9.] Defendants also claim that Mr. Thurman's state law claims are restricted to events occurring after March 16, 2016. *Id*. at 9-11. In contrast, Mr. Thurman contends that all facets of his claims are timely

because Defendants' conduct is "sufficiently related" to conduct that fell within the statutory period and all of the challenged conduct was part of a systematic practice of discrimination against Mr. Thurman.  [R. 154-1 at 11-13.]

Defendants assert that Mr. Thurman's state law claims for discrimination under the Kentucky Civil Rights Act, and his claim for intentional infliction of emotional distress, are subject to a five-year statute of limitations – thus restricting his claims to events after March 16, 2016.  [R. 136-1 at 10.]  For Mr. Thurman's negligent supervision claim the Defendants assert that the applicable statute of limitation is one-year, restricting that claim to events that occurred after March 16, 2020.  *Id*.  Mr. Thurman responds with similar arguments as to his federal claims, asserting that the continuing violation and continuing tort doctrines effectively tolled the statute of limitations for his state law claims.  [R. 154-1 at 13.]

## 1

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any employee on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Under Title VII a plaintiff must file a discrimination complaint within 300 days of an alleged unlawful employment practice covered by the statute.  42 U.S.C. § 2000e–5(e)(1).  The statute's filing provision "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).  A claim is "time barred if it is not filed within these limits."  *Id.*  An alleged unlawful employment practice involves a "discrete retaliatory act or discriminatory act."  *Id.* at 110, 122.  Each discriminatory act constitutes a "single occurrence even when it has a connection to other acts."  *Id.* at 111. This means that "discrete discriminatory acts are not actionable if time barred, even when they

are related to acts alleged in timely filed charges." *Id.* at 113.  However, the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim."  *Id.*

*Morgan* also explained that hostile environment claims are different than other more discrete claims under Title VII.  *Id.* at 15.  And it is easy to see why that is so.  As the Court explained in *Morgan*, "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct."  *Id.*  Indeed, the Court clearly stated that "[s]ubsequent events… may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole."  *Id.* at 117.

Mr. Thurman invokes the equitable "continuing violations" doctrine to support his time-barred claims.  It is true that the *Morgan* decision noted that the 180- or 300-day time period "is subject to equitable doctrines such as tolling or estoppel."  *Id.* at 113.  However, the Sixth Circuit has held that after *Morgan* "plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period."  *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003).  The *Sharpe* decision also held that the remaining path for a plaintiff to establish a "continuing violation" requires the plaintiff to show that the defendant had "a longstanding and demonstrable policy of discrimination" against the class of which defendant was a member.  *Id.* at 268-69.  The Sixth Circuit's decision in *Austion v. City of Clarksville*, 244 F.App'x 639, 647 (6th Cir. 2007), further explained that the continuing violation exception is "strictly construed and is satisfied only where the defendant has a known policy or rule supporting discrimination."  Establishing such a policy requires "something more than the existence of discriminatory treatment" in the plaintiff's case alone.  *Sharpe*, 319 F.3d at 268.

Mr. Thurman has not pointed in his Response [R. 154-1] to any particular policy that the Defendants have conducted that supports discrimination. Most of his allegations deal with either various discrete acts committed against him – retaliation, failure to promote – or ongoing workplace harassment generally. Viewing his allegations charitably, the only such "policy" Mr. Thurman could point to is his allegation that "no…Black employee in the City of Frankfort Public Works Department has made it into a supervisory role or upper echelon position." *Id*. at 4. This absence of Black leadership has some evidentiary support. [R. 142-5 at 14-18.][1] Mr. Thurman has also offered evidence as to limited hiring of Black employees by the Streets Department. *Id*. at 26. However, this circumstantial evidence does not rise to the level required by Sixth Circuit precedent.

In *Austion* the Sixth Circuit held that the plaintiff had failed to establish a longstanding and demonstrable policy of discrimination at the City of Clarksville, Tennessee Police Department. *Austion v. City of Clarksville*, 244 F.App'x 639, 648 (6th Cir. 2007). This was in spite of statistical and documentary evidence presented by the plaintiff in that case, including disparate hiring practices by the department, the usage of racial slurs throughout the department, and multiple complaints by other African-American members of the department. *Id*. at 644-46. Mr. Thurman has not produced sufficient evidence that the Defendants maintain a known policy or rule supporting race discrimination. Thus, he cannot invoke the second continuing violation theory under Title VII.

---

[1] In his Response to Defendants' Motion for Summary Judgment, [R. 154-1], Mr. Thurman refers to a number of other deposition transcripts in support of this claim. Unfortunately, many of the cited deposition pages are not present in the Record. In his Supplemental Filing, [R. 142], Mr. Thurman included several full deposition transcripts. However, he also incorporated others by reference, choosing to rely on the deposition transcripts uploaded by Defendants in their Motion for Summary Judgment [R. 136]. The transcripts attached by Defendants (and referenced by Mr. Thurman) were excerpted versions of the deposition, rather than full copies, and many of Mr. Thurman's references are to pages omitted by Defendants.

This leaves the Court to clarify which of Mr. Thurman's Title VII claims can proceed and which cannot. Because no equitable tolling is of help to Mr. Thurman in this case, his claims involving discrete acts – primarily failure to promote, failure to train, and retaliation – prior to January 2, 2018, are time-barred. Those acts may still present relevant background evidence for his claims that do proceed, but he cannot recover from those acts themselves. As *Morgan* made clear, Mr. Thurman's hostile environment claims are not similarly time-barred due to the nature of the Defendants' alleged misconduct.

## 2

Defendants also claim that many of Mr. Thurman's state law claims are time-barred. [R. 136-1 at 9-11.] Mr. Thurman's civil rights claims are similarly actionable under the Kentucky Civil Rights Act ("KCRA"), K.R.S § 344.010, *et seq.*, and the parties agree that these claims are governed by a five-year statute of limitations. K.R.S. § 413.120(2). Thus Mr. Thurman's claims would be restricted to those events that took place after March 16, 2016. Mr. Thurman again contends that the "continuing violations" doctrine tolls this deadline. [R. 154-1 at 13.] "Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 ("Title VII"), we use the federal standards for evaluating race discrimination claims." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) (citing *Kentucky Commission on Human Rights v. Kentucky,* 586 S.W.2d 270, 271 (Ky.Ct.App.1979)). Mr. Thurman cites several pre-*Morgan* cases in support of his argument. However, Kentucky courts considering the issue post-*Morgan* have adopted the *Morgan* Court's reasoning to prevent "bootstrapping" delayed claims onto newer ones. *Walker v. Commonwealth*, 503 S.W.3d 165, 172-73 (Ky. Ct. App. 2016). Mr. Thurman's continuing violations theory did not successfully toll his federal claims and it similarly does not toll his

KCRA claims. Therefore Mr. Thurman's claims under the KCRA are limited to those occurring after March 16, 2016.

Mr. Thurman has also asserted a state law claim for intentional infliction of emotional distress. The time in which a plaintiff may bring a state claim for intentional infliction of emotional distress is governed by KRS § 413.120(6), which also allows for a five-year statute of limitations. *Shaw v. Handy*, 588 S.W.3d 459, 461 (Ky. App. 2019) (citing *Craft v. Rice*, 671 S.W.2d 241, 251 (Ky. 1984)). Defendants thus contend that the deadline for this claim is therefore also March 16, 2016. [R. 136-1 at 10.] Mr. Thurman does not appear to contest this assertion.

Mr. Thurman also brings a state law tort claim asserting negligent supervision on the part of Defendants. [R. 1.] Defendants assert that this claim is governed by a one-year statute of limitations, limiting Mr. Thurman's claims to events that occurred after March 16, 2020. [R. 136-1 at 12.] In contrast, Mr. Thurman argues that Defendants' alleged negligent supervision falls under the "continuing tort doctrine." [R. 154-1 at 13.] Under this doctrine, "'where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortuous overt act ceases[,]' and each day is considered a separate cause of action." *Stephenson v. CSX Transp., Inc.*, No. 2002-CA001796-MR, 2003 WL 22113458, at *5 (Ky.App., Sept. 12, 2003) (citing 54 C.J.S. *Limitations of Actions* § 177 at 230-31 (1987)). Mr. Thurman sees the ongoing harassment he faced as just such a continuing tort.

Mr. Thurman need not invoke the "continuing torts" doctrine in order to continue pursuing his negligent supervision claims. Courts considering the tort of negligent supervision have emphasized that "[t]he tort of negligent supervision is a second tort that derives from a tort

9

committed by the person negligently supervised." *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001); *Divita v. Ziegler*, No. 2005-CA-001343-MR, 2007 WL 29390 at *9 (Ky. Ct. App. Jan. 5, 2007). In the *Grego* opinion the court therefore applied a five-year statute of limitations to the Plaintiff's negligent supervision claim because the underlying conduct was a tort that did not cause physical injury. *Grego*, 187 F. Supp. 2d at 694 (citing *Craft v. Rice,* 671 S.W.2d 247, 249 (Ky.1984) (holding "the five-year statute of limitations applies when the gist of the tort is the claimed interference with the plaintiff's rights causing emotional distress")); *see also Hoskins v. Knox Cnty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163 (E.D. Ky. Mar. 15, 2018) ("Because the tort of negligent-supervision is derivative of—and dependent upon—the underlying tort of the supervisors' subordinates, the Plaintiffs' negligent-supervision claim accrued…at the same time as the common-law … claim upon which it is based").

The case at hand is a similar situation. The underlying torts Mr. Thurman alleges – intentional infliction of emotional distress, racial discrimination, retaliation, and a hostile work environment – all cause emotional distress via an interference with the plaintiff's rights and are themselves governed by a five-year statute of limitations.[2] Given that negligent supervision is dependent on an underlying tort, it would be illogical for its statute of limitations to be more limited than the tort that precipitated the negligent supervision. Therefore, the Court will apply the five-year limitations period covering injuries to the rights of the plaintiff, K.R.S. § 413.120(6), to the negligent supervision claim.

---

[2] Many Kentucky cases discussing a one-year statute of limitations for negligent supervision are fundamentally inapposite because they deal with negligent supervision based on an underlying tort causing physical injury, meaning the underlying tort itself has a one-year statute of limitations. *See B.L. v. Schuhmann*, 380 F. Supp. 3d 614 (W.D. Ky. 2019) (underlying torts were assault, sexual assault, and battery); *Thomas v. Mayo*, No. 3:21-CV-549-RGJ, 2024 WL 116424 (W.D. Ky. Jan. 10, 2024) (underlying tort was battery and false arrest).

**B**

When analyzing Title VII claims involving circumstantial evidence of discrimination, Courts apply the familiar *McDonnell Douglas* burden-shifting framework. First, the plaintiff must make out a prima facie case of discrimination, which requires that he show: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated differently from similarly situated employees who were not within the protected class. *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 565 (6th Cir. 2012). If the plaintiff satisfies that test, the burden then shifts to the defendant to proffer a legitimate, non-discriminatory explanation for the adverse employment action the plaintiff suffered. *Id*. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's legitimate, nondiscriminatory explanation is merely a pretext for unlawful discrimination. *Id*. Pretext may be demonstrated by showing that the defendant's legitimate, nondiscriminatory reason (1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 258 (6th Cir. 2002). As the Kentucky Civil Rights act "mirrors" Title VII of the Civil Rights Act of 1964, courts use the same federal standards with both statutes. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000).

Mr. Thurman brings a number of racial discrimination claims, including failure to train, failure to promote, denial of overtime, and retaliation. Some of these are time-barred, but others yet persist, and the Court will consider those in turn.

**1**

Turning to Mr. Thurman's claims of "failure to train," the Court notes that based on the evidence in the Record these claims persist under the KCRA, but not Title VII. The parties'

briefs do not make the overall timeline especially clear, but the evidence appears to suggest that the latest evidence of Mr. Thurman requesting training occurred in an email sent to Tom Bradley, the Public Works Director, on September 23, 2016. [R. 136-10; R. 136-22.] In his deposition Mr. Thurman makes clear that he requested various training throughout his time with the City. [R. 141-3 at 26-29.]

An adverse employment action is defined in this circuit as "'a materially adverse change in the terms of [one's] employment.'" *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir. 1996)). Such a materially adverse action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). The Sixth Circuit has acknowledged that a failure to train can constitute an adverse employment action if it results in a deprivation of increased compensation, a passing up for promotion, or some other recognized adverse employment action. *Reed v. Procter & Gamble Mfg. Co.,* 556 F. App'x 421, 429-430 (6th Cir. 2014) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 (6th Cir. 2007)).

On the issue of the Defendants' failure to train, the Court ultimately thinks Mr. Thurman has raised a genuine issue of fact, leaving this question better suited for a jury than the Court. Mr. Thurman is a member of a protected class. Based on evidence he has submitted he should have been as eligible for training as anyone given the Street Department's informal approach to equipment training. Defendants now contend that Mr. Thurman was denied promotions on account of his lacking the relevant skills – including those he was allegedly denied training on – which constitutes an adverse employment action. [R. 136-1 at 15-17.] Mr. Thurman has also

12

presented evidence, in the form of his testimony, that other similarly situated employees, including some that were ultimately promoted ahead of him, were given the training he sought. [R. 141-2 at 84; R. 141-3 at 27-29.]

The Defendants primarily address Mr. Thurman's failure to train claim in the context of retaliation, [R. 136-1 at 38-42], and do not clearly present a legitimate, nondiscriminatory reason to have denied him training. Instead, they contest the facts surrounding his claim that he was unable to adequately train compared to some of his peers. *Id.* The closest thing to such a reason is Tom Bradley's assertion that "[t]he City is under no obligation to train any employee for skills higher than necessary for that employee's pay grade" and that "Superintendents and Foreman, especially those in other Divisions, do not have the available time to respond to such requests from all employees." [R. 136-10.] Given Mr. Thurman's evidence suggesting training was made available to other White coworkers throughout the department over time, a jury could conclude that this reason had no basis in fact and is insufficient to explain the Defendants' conduct. Mr. Thurman has offered evidence suggesting that no African Americans have held supervisory positions in the department, including Tech IV – a prerequisite position for the higher-up positions Mr. Thurman sought. [R. 142-3 at 30-31; R. 142-7 at 29-30, 45-46.] He has also offered evidence of racial bias in individuals, like Eddie Wiley, who would have been involved in the training process. [R. 140-2 at 36, 49-50, 58-59.] That training process was admittedly informal – supervisors encouraged employees to train with operators during times when the equipment was available – but that also meant it was gatekept by alleged racists. [R. 136-4 at 7-8; R. 142-7 at 95-97; R. 142-3 at 62-63.] By denying African Americans in the department the requisite training required for better positions, the Defendants could

hypothetically later deny them those positions based on that "lack" of training.  Mr. Thurman's failure to train claim is therefore able to proceed under the KCRA.

**2**

Mr. Thurman also brings follow-up failure to promote claims.  Many of these are time-barred, but the Court will consider those occurring after 2016.  According to Mr. Thurman's Complaint, [R. 1], the sought promotions were: an engineering tech position in 2016, Foreman of Public Works in 2017, Garbage Superintendent in 2017, Transit Foreman in 2017, Superintendent of Public Works in 2018, and Foreman of Public Works in 2018.  Mr. Thurman asserts that he was qualified for these positions due to his experience, seniority, and strong performance evaluations.  In contrast, Defendants contend that Mr. Thurman was objectively unqualified for these positions and that the jobs went to candidates with more applicable experience.

Following a now-familiar framework, a plaintiff seeking to show a failure to promote must show that: (1) he is a member of a protected class; (2) he was qualified for promotion; (3) he was "considered for and denied the promotion"; and (4) "other employees of similar qualification who were not members of the protected class received promotions."  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009).  If he meets these prima facie requirements, similar burden shifting as discussed above occurs.  To establish that she is qualified for the position, a Title VII plaintiff need only show that she satisfied an employer's "objective" qualifications.  *Id*.  Unfortunately, Mr. Thurman has not done so here.

For many of the promotions Mr. Thurman has not pointed to any particular evidence that would support his assertions.  Instead, he has kept his arguments more generalized, leaving the Record lacking as to the required qualifications for many of the sought positions.  Accordingly,

he has not met his burden as to those claims.  However, the Record does present evidence as to the requirements for the positions Mr. Thurman sought in 2018 – Foreman and Superintendent. These positions required a number of skills, some of which Mr. Thurman had and some of which he did not.  [R. 136-17; R. 136-18.]  Considering only Mr. Thurman's objective qualifications, he was not able to fulfill the responsibilities of Foreman and Superintendent because he lacked the heavy equipment skills those positions require.  Deposition testimony shows, and Mr. Thurman presents no evidence to dispute, that the Foreman and Superintendent positions often involve filling in and performing the duties of subordinates, including operating heavy equipment.  [R. 136-4 at 10-11.]

Mr. Thurman contends that this lack of an objective qualification stems from the prior discriminatory failure to train.  Maybe so. The Sixth Circuit has little guidance on bootstrapping a failure to train claim onto a failure to promote claim, but has treated the two claims as clearly distinct.  *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421 (6th Cir. 2014) (assessed failure to promote claim while holding linked failure to train claim had been waived on appeal).  The Seventh Circuit in *Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto.*, 210 F.3d 750 (7th Cir. 2000), dealt with a plaintiff arguing, similarly to Mr. Thurman, that a prior discriminatory lack of training had led to a lack of qualifications and a failure to promote.  The *Maarouf* panel held that "[w]here the failure to acquire the skills necessary for promotion stemmed from a discriminatory denial of opportunities, the employee must bring a discrimination claim challenging the denial of opportunities rather than a challenge to the failure to promote."  *Id*. at 753-54.  Given the treatment of a failure to promote and a failure to train as discrete acts, and the *Morgan* decision's limitations on linking discrete acts into a long chain of claims, the Court finds this ultimately

15

persuasive. Mr. Thurman's lack of objective qualifications may be connected to a prior discriminatory failure to train, but that does not help him establish his prima facie case.

It is further clear that Mr. Thurman could not make out the rest of his prima facie case. To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000). Exact correlation is not required but "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Id*. For his applications to Foreman and Superintendent, Mr. Thurman identifies the individuals who received the positions in his place – Daniel Doss and David Gipson, Jr., respectively. At the time of his applications, Mr. Thurman was a Tech III. [R. 141-3 at 39.] Doss was a Tech IV/Heavy Equipment Operator and Gipson was a Foreman. [R. 136-3 at 20-21; R. 136-19.] In the rigidly hierarchical system that was the Streets Department, Mr. Thurman was not similarly situated to the higher-ranking Doss and Gipson in all relevant aspects. Even if Doss and Gipson were treated preferentially in years past, leading to their divergent paths today, it is that treatment Mr. Thurman should have challenged.

While the analysis bleeds together, Mr. Thurman also cannot show that the promotion of Doss and Gipson over him was pretextual. He has introduced ample evidence to suggest some racism occurred in the Streets Department. [R. 141-2 at 36-37, 49-51, 55.] However, he has not introduced evidence into the Record to suggest that the individuals making the hiring decisions were themselves racially biased. Mr. Thurman suggests that the city conducted "racially biased testing" when African-Americans applied for City jobs. The evidence on such testing is not

16

robust enough for Mr. Thurman to survive summary judgment. In support of his claim, he offers the testimony of Mr. Bobby Ripy to suggest that the City only requires these tests for Black applicants. [R. 142-8.] But Ripy's testimony establishes only an extremely limited view of the testing that occurred. He administered only four tests, had no knowledge of how the tests were created or scored, and had no knowledge of other testing throughout the Department and the City. *Id*. at 27-30, 60-67. In contrast, other testimony establishes that, for a period, the City conducted widespread testing across positions and departments. [R. 144-4 at 8-11.] Ripy's testimony may tell part of the story, but it lacks the necessary context – even when viewed in the light most favorable to Mr. Thurman – to defend his ultimate assertion. Having considered the evidence presented, the Court finds that the Defendants are entitled to summary judgment on Mr. Thurman's failure to promote claims.

**3**

The Court now examines Mr. Thurman's claims of retaliation. Again following the *McDonnell Douglas* framework, a prima facie case of retaliation requires a plaintiff to establish that: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 639 (6th Cir. 2009). If the plaintiff meets this prima facie burden, the burden shifting proceeds similarly to the other claims Mr. Thurman has addressed – the defendant must articulate a legitimate, nondiscriminatory reason for the action and the plaintiff must present evidence that this reason was mere pretext. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008).

17

Mr. Thurman alleges he engaged in protected activity when he emailed Tom Bradley about his employment concerns and when he filed his EEOC charge and that Defendants retaliated by disciplining him under false pretenses, investigating him based on anonymous complaints, reassigning him to less desirable positions, denying him overtime, and engaging in malicious and racially charged pranks by greasing his truck's door handle and leaving a banana inside for him to find. In response, Defendants contend that Mr. Thurman cannot show these incidents are causally connected to his protected activities, that he was not denied overtime, and that his reassignment was actually to his benefit.

An individual engages in a "protected activity" under the ADA when "such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). The Equal Employment Opportunity Commission ("EEOC") has identified a number of examples of "opposing" conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and co-workers. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (citing *EEOC Compliance Manual,* (CCH) ¶ 8006). Mr. Thurman's repeated complaints to supervisors, including his email to Tom Bradley fall squarely within the ambit of "protected activity," therefore the Court considers those elements that are contested.

Turning to Mr. Thurman's allegation of retaliation via racially charged pranks, the Court finds that Mr. Thurman has not made out his prima facie case, at least with these actions.

Defendants hang their hat on the anonymous nature of several of the activities (the handle greasing and the banana). In their view, Mr. Thurman has not shown that these actions were connected to the protected exercise of Mr. Thurman's rights. The Court agrees. Under Title VII the banana and the greased truck handle better fit Mr. Thurman's hostile work environment claims, as opposed to his retaliation claims, because the protection only triggers if the plaintiff suffered an adverse employment action. As noted above, an adverse employment action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 797 (6th Cir. 2004) (en banc). While "adverse employment action" is a broad category, it is not met here with those particular isolated incidents.

Assuming it were, Mr. Thurman still has not presented any evidence tying those acts to his protected activities, nor to his alleged retaliators. The banana incident appears to have occurred on April 4, 2018. [R. 136-23.] Mr. Thurman's email to Tom Bradley was in 2016, [R. 136-10], almost two years prior, and his EEOC complaint was made in October 2018, six months *after* the banana incident. [R. 136-11.] The greased truck handle occurred in August 2019, almost a year after Mr. Thurman filed his EEOC complaint. [R. 136-5 at 31-32.] Allegedly retaliatory acts temporally attenuated from a protected activity need to be coupled with other evidence of retaliatory conduct to establish causality. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Even if those incidents occurred exactly as Mr. Thurman describes, a jury could not reasonably infer that they were acts of retaliation. Based on the evidence in the Record it is entirely unknown who engaged in these malicious pranks or what their motivation was.

The Court now turns to the investigation into Mr. Thurman due to an anonymous complaint. Defendants attempt to recharacterize the relevant retaliation as the anonymous complaint itself. While that may be retaliation in some instances, in this case it seems as if the real retaliation was the investigation. And there is no question that the investigators were aware of Mr. Thurman's complaints. Instead, this argument better fits as a legitimate, nondiscriminatory reason for the adverse action.

Mr. Thurman must also show that the investigation was causally connected to his reporting. The Sixth Circuit has held that where an adverse employment action "occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey*, 516 F.3d at 525. However, the panel in *Mickey* also emphasized that "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* In this case Mr. Thurman has not pointed to particular evidence in the Record to show a causal connection between the investigation and his protected complaints. The timeline too is unclear, as neither party points to evidence establishing exactly when this investigation occurred, other than to suggest that it occurred some time after Mr. Thurman reported. Mr. Thurman therefore fails to establish his prima facie case of retaliation via the Defendants' investigation into complaints made against Mr. Thurman. Even if Mr. Thurman had made out his prima facie case, he has not shown evidence to demonstrate that the investigation was pretextual. Mr. Thurman's generalized grievances with the investigative process are not enough for a jury to find that such an investigation was a mere pretext to retaliate against him.

Mr. Thurman also alleges that Tom Bradley retaliated against him by disciplining him for a damaged gas tank shortly after Mr. Thurman sent Bradley an email complaining about discrimination in the department. In response Defendants argue that this was deserved discipline that Mr. Thurman cannot causally link to his prior report. As an initial matter, this incident was only a few short months after Mr. Thurman's initial complaint. [R. 136-7 at 9-10; R. 136-11.] And while the issue of timing may be a close call, Mr. Thurman has presented additional evidence to suggest this discipline was more than it seemed. Zack Smith, who was along with Mr. Thurman on the day the damage apparently occurred, was not similarly disciplined and confirmed in his deposition that discussions with supervisors over the incident were directed primarily at Mr. Thurman's role in the damage. [R. 142-3 at 54-56; R. 141-3 at 157-158.] The issue itself – a failure to report minor damage – along with the context, gives rise to the possible inference that this was a pretextual way to retaliate against Mr. Thurman. It is perhaps telling that Defendants' response to this incident has been to insist that Mr. Thurman violated city policy, rather than produce evidence of other individuals being disciplined for similarly minor issues. [R. 136-1 at 28-30.] Mr. Thurman has therefore presented enough evidence to survive summary judgment as to his claims of retaliation.

Mr. Thurman's claims would also survive summary judgment on account of his last two alleged incidents of retaliation – reassignment to sign crew and an accompanying denial of overtime opportunities. To establish an adverse employment action with regards to retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). An act can also be an adverse employment action if the

employee received "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).

Mr. Thurman argues that his reassignment to sign crew was essentially the equivalent of being put out to pasture – a dead-end position with no opportunity to gain new skills, no opportunity for improvement, and no opportunity for promotion. [R. 141-2 at 9-10, 69.] In contrast, Defendants contend that sign crew is a sought-after position where the old work horses of the department can coast their way to retirement. [R. 136-3 at 7-8.] There is certainly evidence, including Mr. Thurman's own testimony, to suggest that some people enjoyed sign crew. [R. 141-2 at 22.] Mr. Thurman's co-worker on sign crew, Jamie Bingham, was even on it voluntarily. [R. 141-3 at 196.] Still, a triable issue remains. A jury could certainly find that Mr. Thurman's reassignment was in fact complimentary, not retaliatory, on account of the ease of the job and its occasionally sought after status. More importantly for our current posture, the jury could also find that the reassignment was a retaliatory and adverse action. On multiple occasions, even towards the end of his time with the City, Mr. Thurman indicated his desire to move up the ranks and improve himself. Indeed his email to Tom Bradley, one of the activities that allegedly initiated some of this retaliation, indicated as much. [R. 136-22.] Mr. Thurman's supervisors were aware of his desire to improve and receive additional training, made clear from both internal documents and his more formal complaints. Their response was to put him somewhere he could neither improve nor grow, but only fade away. One man's dream may be another's nightmare, and it is not the Court's job to decide whether Mr. Thurman's reassignment to sign crew was a blessing or a curse.

The denial of Mr. Thurman's overtime is largely imbedded into his reassignment to sign crew. Beforehand he was regularly able to volunteer for or otherwise obtain overtime on various assignments. [R. 141-2 at 12, 69-70.] Afterwards he was given no overtime, despite attempts to do so. While the timeline of Mr. Thurman's denial of overtime may be problematic on its own, it appears to also be a natural consequence of being assigned to a largely do-nothing crew – if the work is easy, then it stands to reason that the City is not regularly paying overtime for it. A jury could therefore find that Mr. Thurman's reassignment essentially included restrictions on overtime and that the denial of his attempt to volunteer for overtime was part of that same pattern.

## C

To succeed on a claim of a racially hostile work environment, a plaintiff "must demonstrate that (1) []he belonged to a protected group, (2) []he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). On summary judgment, the Court looks at the totality of the alleged race-based harassment to determine whether it was "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017). In determining whether an actionable hostile work environment claim exists, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Significantly,

23

"isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Occasional offensive utterances do not rise to the level required to create a hostile work environment because, "[t]o hold otherwise would risk changing Title VII into a code of workplace civility." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (internal quotation marks omitted).

Mr. Thurman alleges numerous forms of harassment, including: his prior claims of retaliation and failure to train, the usage of slurs and racially charged epitaphs in the workplace, and targeted harassment from supervisors. Defendants respond by suggesting Mr. Thurman cannot show the conduct was sufficiently severe or pervasive, that some alleged statements have either gone uncorroborated or been denied, and that he has not shown the harassment was based on his race.

As an initial matter, the Court must consider the extent to which Mr. Thurman's prior discrete act claims can be used to support his hostile workplace claim. In *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir. 2024), the Sixth Circuit held that the plaintiff could not rely on discrete acts which could support independent discrimination claims to support her hostile workplace claim. However, the Sixth Circuit has since clarified that *Ogbonna-McGruder* merely serves to "bar a plaintiff from including in a hostile-work-environment claim only those discrete acts that result in a separate discriminatory harm to the terms and conditions of employment that does not 'contribut[e]" to the alleged environment of harassment.'" *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 903 (6th Cir. 2024). While some of the acts Mr. Thurman alleges can, and have, formed the basis for other discrimination claims, the Court must still consider "whether the incidents were also weaponized as tools of

24

harassment in the 'same actionable hostile work environment practice.'" *Id*. The Court ultimately believes Mr. Thurman has presented a triable issue as to his harassment claims.

Mr. Thurman suggests that his repeated denial of promotions was evidence of harassment. However, this court has already found that Mr. Thurman was unqualified for many of the promotions he sought on account of his lack of training. Justified and unactionable denials of promotions are not evidence of a racially hostile workplace. Mr. Thurman also points to the denial of training as harassment. *McNeal* opens the door to this argument and the Court finds it persuasive. While Mr. Thurman's denial of training was the basis for its own claim, he has also presented evidence suggesting it was closely tied to the harassment he faced at the hands of Eddie Wiley, a heavy equipment operator that would have been involved in some of the training Mr. Thurman sought. [R. 140-2 at 36, 49-50, 58-59.] On repeated instances Mr. Thurman observed Wiley make racist remarks about African-Americans, including some of Mr. Thurman's coworkers. [R. 141-2 at 49-50, 58-59.] Some of these comments even appear to suggest Wiley was in favor of racial violence. *Id.* at 60. In his deposition Mr. Thurman also makes clear that some of these comments were made in the presence of supervisors.[3] [R. 141-3 at 161.]

This is far from the only evidence of racial harassment in the department that Mr. Thurman provides. Mr. Thurman's deposition testimony provides evidence that a racist picture was placed on a calendar in his work space. *Id*. at 198-199. It also evidences direct harassment on the part of his supervisor Daniel Doss, including menacing Mr. Thurman and a statement that

---

[3] Defendants point to Defendant Doss's denial of witnessing Wiley make some of these comments to suggest he was uninvolved in or unaware of the harassment. A jury could certainly find Doss credible as to this denial. It could also find Mr. Thurman credible as to the nature of the situation. At the summary judgment stage, it is not appropriate for the Court to weigh the credibility of the witnesses in such situations.

Doss "did not like [Mr. Thurman's] kind." [R. 141-2 at 33; R. 141-3 at 102-103, 121-122.]

Doss even repeatedly indicated he would never have a Black supervisor over him. [R. 141-2 at

36-37.] At one point Mr. Thurman was directed to go to a particular work truck where he found

a banana placed inside – a "prank" he suggests has strong racial overtones. *Id.* at 66-67. Mr.

Thurman also provides evidence that supervisor David Gipson, Jr. directed Mr. Thurman to go to

a "Cultural Diversity class" when in reality Mr. Thurman was to meet with a City attorney. [R.

141-3 at 85-86.] Defendants contend that these various "isolated" incidents cannot establish that

the harassment was severe and pervasive. Each of these incidents may seem isolated, even

juvenile, standing alone, but put together with other evidence they paint a picture of a workplace

rife with racial harassment. Furthermore, there is significant evidence in the Record to show that

slurs and other racially charged language were frequently used throughout the department. In

some instances, Mr. Thurman was directly subjected to slurs from coworkers. [R. 141-2 at 34.]

　　　Once a plaintiff establishes that they experienced a hostile work environment, the Court

"determine[s] an employer's liability for the harassing employee's conduct based on the status of

the harasser." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021). If the harasser is

a co-worker, then the Court asks whether the employer "knew or should have known of the

charged [racial] harassment and failed to implement prompt and appropriate corrective action."

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). For supervisors the Court applies

a stricter standard, holding the employer strictly liable "[i]f the supervisor's harassment

culminates in a tangible employment action." *Wyatt*, 999 F.3d at 412. If the alleged harassment

does not result in a tangible employment action, the employer may raise the affirmative defense

that (1) it exercised reasonable care to prevent and correct any racially harassing behavior and

(2) that the plaintiff employee unreasonably failed to take advantage of any preventative or

corrective opportunities provided by the employer or to otherwise avoid the harm.  *Id*. at 414.  If there are genuine factual disputes about whether an alleged harasser qualifies as a co-worker or a supervisor, a plaintiff can proceed under both theories.  *Id*. at 412.

The facts of this case satisfy both kinds of harassment. As noted above, racially charged language and slurs were used throughout the department for many years.  And the Record too shows that a genuine dispute exists over whether supervisors should have been aware of this racialized harassment.  Many of the department's supervisors rose through the ranks, starting as techs and laborers before they became foremen and superintendents.  Given the widespread ubiquity of racially insensitive language in the department, a jury could certainly find that supervisors were aware of the harassment.  This is not to mention the multiple instances where Mr. Thurman reported or mentioned the harassment he experienced.

Some of the harassment also occurred at the hands of supervisors, though the parties dispute the scope of "supervisor" in this case.  Crucially, Defendants contend that Wiley does not qualify as a supervisor because he did not have the power to take tangible employment actions against Mr. Thurman.  Based on the evidence, Mr. Thurman has presented evidence to suggest Wiley may have had some supervisory status.  First, the Court has already determined that Mr. Thurman presents evidence of a failure to train.  "When 'decisionmaking power' rests in the hands of 'a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee,'" leading  to the conclusion that an employer "may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  *Id*. at 413 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 447 (2013)).  The department has a number of employees and only a few foremen and

superintendents.  Wiley as a heavy equipment operator would have been involved in some of the training Mr. Thurman sought and the failure to provide that training could itself constitute an adverse employment action.  This is made especially relevant by the informal approach the department took to heavy equipment training, leaving the training to be gatekept by individuals with the relevant skills to teach – in this case Wiley.  Furthermore, multiple employees, including Wiley himself, admit that Wiley often had a supervisory role.  [R. 141-2 at 20; 141-3 at 104, 173; R. 142-3 at 21; R. 142-7 at 38-39.]  Mr. Thurman has also presented other evidence that supports his theory of supervisory liability, including racist and suspect remarks from supervisors such as Daniel Doss.

Nor can Defendants rely on an affirmative defense to prevail at this stage.  When Mr. Thurman brought this behavior to the attention of supervisors his complaints went nowhere.  Indeed, Mr. Thurman was himself disciplined for his negative interactions with coworkers.  [R. 136-6; R. 136-7.]  Mr. Thurman also testified in his deposition that he was repeatedly verbally berated by supervisors for minor or imaginary incidents, subjected to harassing games, and reassigned to less desirable jobs for no clear reason.  [R. 141-2 at 14-16, 40, 47-48; R. 141-3 at 81-83, 127-128.]  The environment Mr. Thurman found himself in presents at least some evidence that those assessments of his attitude were at least in part driven by racial undertones.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 395 (6th Cir. 2008) (finding description of Black applicant as "aggressive" in an interview could support claim of racial discrimination).  Mr. Thurman even testified that a clique of his racist coworkers – including Wiley and Doss – would frequently attempt to "stir up trouble" for him. [R. 141-2 at 36.]  Mr. Thurman has presented evidence suggesting Defendants failed to exercise reasonable care to prevent harassing behavior, including failing to adopt appropriate policies or provide workplace harassment

training.  They also cannot show Mr. Thurman unreasonably failed to take advantage of corrective opportunities.  The evidence does show that at various points Mr. Thurman appeared to walk back some of his complaints when challenged.  [R. 136-7 at 5.]  However, some of these complaints were made to the very same supervisors accused of racism and it appears nothing came of them anyways, no matter how serious the allegations.  Mr. Thurman can also again point to the ubiquity of the racism in his workplace to support the inference that walking back his accusations was safer than pressing forward with them.

Drawing all inferences in favor of Mr. Thurman, the evidence shows a workplace where African-American workers, including Mr. Thurman, were frequently subjected to racially charged language.  It also shows harassment against Mr. Thurman by racist coworkers with influence over his access to training.  And it shows a workplace where supervisors were aware of, and even participated in, the harassment.  The Court ultimately believes Mr. Thurman has presented a triable issue as to his harassment claims.  The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory" but that bar was met here.  *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).

### D

The Court now turns to Mr. Thurman's claim of negligent supervision.[4]  When determining state law claims, this Court must apply the law of the state in which it sits.  *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). Therefore the Court turns to Kentucky law as applied to claims of negligent supervision.  In determining Kentucky law only the decisions of the highest

---

[4] Defendants appear to have also moved for summary judgment on Mr. Thurman's intentional infliction of emotional distress claim.  [R. 136-1 at 1.]  However, they have presented no argument on that claim. Therefore, their motion for summary judgment as to Mr. Thurman's IIED claim is **DENIED without prejudice**.

court of Kentucky bind this Court. *See Comm'r of Internal Revenue v. Bosch,* 387 U.S. 456, 465 (1967). Ultimately, this Court must predict how the state's highest court would rule. *Dinsmore Instrument Co. v. Bombardier, Inc.,* 199 F.3d 318, 320 (6th Cir.1999) (citing *Northland Ins. Co. v. Guardsman Prods., Inc.,* 141 F.3d 612, 617 (6th Cir.1998)). The Court may disregard an intermediate state court decision if it is convinced that the highest state court would decide otherwise. *See Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999).

Under Kentucky law, the elements of negligent supervision are: (1) that the defendant knew or had reason to know of the employee's harmful propensities; (2) that the employee injured the plaintiff; and (3) that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries. *Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). In the Defendants' view, Mr. Thurman has failed to carry his burden as to the first and second elements. [R. 136-1 at 43-44; R. 144 at 21-25.] They contend that no underlying harm occurred and that, even if it had, there is no evidence to find that the Defendants knew or should have known about discrimination occurring in the Department and toward Mr. Thurman. *Id*. The Court disagrees as to the Defendants' second justification and the first is ultimately parasitic to the Court's analysis of Mr. Thurman's other claims.

Turning to the Defendants' knowledge of the discrimination alleged by Mr. Thurman, Mr. Thurman has shown some affirmative evidence suggesting that the relevant Defendants were meaningfully aware of discrimination occurring in the Department. In his Response to Defendants' Motion for Summary Judgment, [R. 154 at 9], Mr. Thurman refers to several depositions and conversations that could potentially support his claims. Unfortunately, those items are not in the Record before the Court. A recorded meeting between Thurman and Department Heads Tom Bradley and Keith Parker is referenced by Thurman – no transcript or

recording of that conversation is available to the Court. Instead, Mr. Thurman has provided only a written summary of that meeting with some excerpted quotes. [R. 141-19.] Mr. Thurman also refers to the deposition of William May, former Mayor of Frankfort. While some parts of May's deposition were attached as exhibits, [R. 136-14; R. 144-6], the Record does not include page 70 to which Mr. Thurman refers in his Response. [R. 154 at 9.] Documents must be in the Record to support summary judgment. Fed. R. Civ. P. 56; *see also RES-NV CHLV, LLC v. Rosenberg*, No. 2:13CV115DAK, 2014 WL 6610729 (D. Utah Nov. 20, 2014). While the Court has little reason to doubt the descriptions Mr. Thurman has provided of some of these conversations, the Court also "has no ability to verify the information contained in the documents." *Id*. at *1. Therefore, the Court considers only the evidence on negligent supervision which it finds before it.

In Mr. Thurman's favor, the record does briefly reflect an attempt he made to notify Tom Bradley, former Public Works Director, of prior racism in the Street Department. [R. 144-5 at 5-6.] In that conversation, Mr. Thurman made a passing reference to an event from years prior where another employee effectively said they would never work for someone who is black. *Id*. When Bradley told Mr. Thurman he would investigate that incident, Mr. Thurman stated that he did not want Bradley to do anything about it. *Id*. Bradley did not undertake any further investigation. *Id*. The transcript suggests Bradley and Mr. Thurman had a second conversation about racism occurring in Solid Waste, but the full transcript detailing anything further, including the nature of that conversation and any other steps Bradley took, is also unavailable. *Id*.

The record also reflects other brief attempts by Mr. Thurman to notify supervisors and higher-ups of problems in the department. In his September 13, 2022, deposition Mr. Thurman

detailed how he discussed the hostile work environment and racism in the department with Mayor May during an impromptu conversation.  [R. 141-2 at 48.]  The conversation also acknowledged "no blacks were getting promoted."  *Id*.  A little further on in his deposition Mr. Thurman indicated that in March 2018 he told Supervisor David Gipson about racially charged language used by other employees.  *Id*. at 49; *see also* [R. 136-7 at 5.]  Gipson stated that he would "look into it," but Mr. Thurman is unaware if Gipson did so or if anyone was disciplined as a result of that report.  *Id*.  Mr. Thurman certainly observed individuals make racist comments around fellow employees, including in the employee breakroom.  [R. 141-3 at 154-157.]  Mr. Thurman's deposition testimony also references other problematic incidents with racial overtones, including a photo display in the breakroom of "a little black boy and a raccoon on the calendar" near where Mr. Thurman would usually sit.  *Id*. at 198-199.

The facts of this case present a close call as to whether Defendants knew or should have known of racial harassment in the department.  Under the summary judgment standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir. 1992).  Ultimately, the Court thinks that a jury could find for Mr. Thurman on this issue, rendering summary judgment inappropriate.  While parts of the Record are patchy, if Mr. Thurman's testimony is to be believed then he did make multiple attempts to let supervisors and city officials know about the ongoing harassment.  Furthermore, the Record is clear that racial epithets and racially insensitive comments were made in the workplace frequently enough that black employees were aware of it, even if they did not always observe it.  [R. 142-7 at 56-63.]  While supervisors may not have been in the direct presence of these comments, it is entirely possible for a jury to infer that they would have, or should have, known.

**III**

As the Defendants' Motion for Summary Judgment has raised a number of issues, the Court will summarize its conclusions for the clarity of the parties. Mr. Thurman's discrete act claims under Title VII for acts prior to January 2, 2018, are time-barred. However, his hostile environment claims are not, and prior discrete acts can continue to provide relevant background evidence for those claims that do proceed. Mr. Thurman's parallel claims under the KCRA are similarly time-barred and are limited to those acts occurring after March 16, 2016. Mr. Thurman's state law negligent supervision claim is, like the KCRA, subject to a five-year statute of limitations.

Turning to Mr. Thurman's substantive claims, his failure to train claim is able to proceed. However, his failure to promote claims are not. Mr. Thurman also alleged retaliation against him occurred in several ways. His retaliation claims based on anonymous pranks and an internal investigation fail, but his retaliation claims based on reassignment, improper discipline, and denial of overtime are supported by enough evidence to proceed. Mr. Thurman's hostile workplace claim is likewise sufficiently supported by evidence and must proceed. Finally, Mr. Thurman's claim of negligent supervision also survives the Defendants' Motion for Summary Judgment.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendants' Motion for Summary Judgment **[R. 136]** is **GRANTED IN PART** and **DENIED IN PART**;

2. Defendants' Motion for Leave to File Excess Pages **[R. 137]** is **GRANTED**;

3. Defendants' Motion for Extension of Time to File Reply **[R. 143]** is **GRANTED**; and

4.  Defendants' Motion for Leave to File Excess Pages **[R. 145]** is **GRANTED**.


This the 17th day of December, 2024.


Gregory F. Van Tatenhove
United States District Judge